I find my notes. All right. Thank you, Your Honor. May it please the court. Miss Lucas. My name is Ben Bergman and I represent Matthew Parrish in this 1983 action. We're here on the grant of the defendant's motion for summary judgment on qualified immunity. However, viewing the light or the evidence in the light most favorable Mr. Parrish, Jailer Dingman's force was excessive and not objectively reasonable. The instructive case is the Shackleton case, which is also out of the Northern District. Buck Shackleton actually grew up 10 miles north of me. In that case, you all noted that the force in that case was unreasonable because Mr. Shackleton was an unarmed suspected misdemeanor. He didn't resist arrest. He didn't threaten the officer. He didn't attempt to run from him. He didn't behave aggressively toward him. It's a taser case though, right? It is a taser case. Yeah, this is not anywhere near tasing, is it? No, it isn't. But I think there's some other facts in this case that make it worse than Shackleton. And I'm going to hop down because this is something that struck me as I was getting ready for this argument. If you look at all the cases we cited, Shackleton. Would you lower the lectern? You have a very powerful voice. And I think if you lower it a little bit, you won't be quite so close to the microphone. I will try that. Thank you. And I'll push it away a little bit too. Shackleton. Officer told him to put his hands behind his back, but he could not. Vester. Refused to comply with repeated commands. Ryan. Gacky told Harold to back away from the door, but did not comply. Hicks. Told to give booking and told to change uniform, did not comply. My niece is two and a half years old and we're working on her to use her words. Use her words. In this case, what's different here and what makes it worse than Shackleton? Mr. Dingman did not use his words. He used violence instead of using his words. That is objectively unreasonable. We're arguing about what, and I don't know if this is a PC term, what a crippled man does with one good arm with a flimsy mattress in his hand. And when he takes a step toward a door, is it objectively reasonable to slam it on the ground? He put the mattress in the door though, right? If you look at the video, don't you think that's the fair view? Hmm. I think that that, that is a close call. And I'm going to stand on viewing it in a light, most favorable to the plaintiff. I think that's a real close call and putting it in the door and it being in the door are two different things too. Right? Because it's like, you have to think, let me gather my thoughts a second here. I think what this comes down to is on this issue of the mattress is that the defendant has done a good job of saying how this is a split second call, right? But as I was reviewing at this, it's not a split second call. It really is not at all. It's a split second call because officer Dingman set decides he has to use violence instead of using his words. He's got a guy here, Mr. Parrish that he trusted so much. He had him sit in a chair in a garage for 45 minutes waiting to book him. He stood there. What does the record show? Again, if anything about the disparity of the physical size and condition of these two, the defendant and your client, I can tell you that officer Dingman is bigger and healthier and I, can we see that from the video? I've looked at the video several times. Yes, you can see it from the video and I believe it's in the appendix. We cite to it in a brief, so it should be in the appendix, but I don't have that handy right in front of me. But I would guess Miss Lucas. I'm sure has that that he's probably three to four inches taller and 30 40 pounds heavier. And again, to what extent did the defendant know about your client's physical disabilities? He knew about him. He told him about it. And that consisted of a motorcycle injured foot or something, right? He's got a two inch orthotic on one foot and he's got scars all over his arm on the other arm. I mean, he's kind of half a man. And mr. Dingman, let him keep his orthotic shoe and his and his glasses because he's also got double vision from a head injury. When he went into the jail cell backing up a little bit. I don't want to punt on your question judge Ben and it's that we have been are thinking about. This has been uptight that this isn't a split-second situation ever. It didn't have to be a split-second situation. That's how we're getting to this thing. Well, did he put the mattress in the door or did it happen to be in the door? Did it touch him? Did it not? The reason that all comes around is because we're thinking that it was okay for officer Dingman to go and lay his hands on him to start with and not say back up. This is where you're going back up against the door. I'm closing the door. That was the objectively reasonable action there and we get the splitting hairs when we think and we presume that it was okay to take that first action without using his words. Your time's tight. What do you think your closest case is Shackleton? I agree with your distinction that it is a taser case, but in all other and all other aspects Shackleton is on point Shackleton has greater use of force. But in this case, we don't have the words. We don't have any instructions that he failed to comply with so I would say add one subtract one at Shackleton. Actually got through a lot of this faster than I thought it was going to. I talked about that officer Dingman, you know, he we have to look at him objectively right and we can't forget everything that happened earlier in that night when we think about his actions when he gets to the jail cell. He notices that he's handicapped. He says you can keep your orthotic foot. He's so little concerned of him that he has him sit in a chair in a garage for 45 minutes. There's no evidence in the record that he was supervised at all. The evidence shows that officer Dingman had no reason to believe that Mr. Parrish could even do him harm. He recognizes disabilities. The issue here is that is this active resistance or is this passive resistance or is this resistance at all? And I think that this is a really important part of this case and it goes all the way back to using your words. Is it heretofore after the decision of this court today on this case motion for summary judgment that anytime a detainee steps toward an officer that the officer can use violence in lieu of words? Will the ruling of this court be that the compliance of a detainee prior including sitting there and being a good boy for 45 minutes doesn't make any difference. The violence can still be used. It doesn't make any difference if the detainee can actually do physical harm. Will this ruling mean that anytime a detainee disagrees with an officer an officer can use violence against the detainee? You know, the facts aren't going to matter much, you know, you can be one fact away with the taser, right? And then it doesn't matter, you don't have to say anything, you can slam him down on the ground. Doesn't matter if he's got a head injury, got one leg that's two inches shorter than the other, can't use an arm. In fact, what will happen is the concept of passive resistance will fade and you're just going to have any resistance. And you're going to have all of these granted for summary judgment and these are never going to go to trial.  That's all we're asking you to do is to reverse the judgment of the district court on the summary judgment. I do want to save a little bit of time for rebuttal and I'm going to do that now if you don't mind. Very well. Thank you. Ms. Lucas, good morning. You may proceed.  May it please the court, counsel. My name is Catherine Lucas from the Bradshaw Law Firm here on behalf of Jason Dingman and the Hamilton County defendants. And we respectfully request that this court affirm the grant of the district court's granting of summary judgment. Your honors, we believe this case is incredibly straightforward and can be summed up by the video you've seen and the testimony of Mr. Parrish that's included on page 68 of the joint appendix. In which on that page, two admissions, undisputed admissions are included. The first in which Mr. Parrish admits that he was trying to put the mattress in the doorway to stop the door from closing. He admits he was impeding Jailer Dingman's ability to do his job and maintain the security and safety of the jail. The second fatal admission on that same page is that contrary to counsel's assertion, Mr. Parrish was never thrown to the ground. He was never slammed to the ground. This was a controlled movement in which Jailer Dingman had his hands on the plaintiff and the entire time. It was a take down, not a throw or a slam. For those reasons alone are sufficient to affirm. It may be a highly, well, that's your interpretation of it. What does the video permit us to infer? Absolutely that, your honor. That at all times, Jailer Dingman had his hands on the plaintiff when he put him onto the ground. Moreover, this court- What was the reason why he had to put him on the ground at all? To secure handcuffs, your honor. He was not handcuffed during this interaction and after he- And it suddenly became necessary to handcuff him after he had permitted this man to sit on his chair for 45 minutes? Your honor, he, the, when- There was no physical threat to your client, was there? My client believed that there was a perceived threat of escape or perceived safety concern. The mattress did hit his- That might pass the laugh test, but I don't know. The laugh test, I mean, this guy, this man with a shortened foot, a head injury, disabilities, withered arm, is going to overcome this much larger deputy sheriff? Well, for a couple things, your honor. I would disagree with the characterization that they are that disparaging in size. They're relatively, I believe- But your client was not, was more hale and hearty, healthy than Mr. Parrish. Would you agree with that? I would agree with that, your honor. However, I'd point out to the court that Mr. Parrish was allowed to keep his orthotic shoes. He was allowed to keep his glasses. He could ambulate to the cell. I'll put your use of your euphemistic terms. After he was put gently to the floor by Mr. Dingman's gentle hands around his throat. Excuse, I'm sorry. Well, that's my characterization. Well, your honor, if that, if this segues into one of the points I'd want to bring up, that I will get you a 28E letter, but I reviewed- 28J. 28J. I have reviewed- Well, J, J, definitely J then. I reviewed the case law post-briefing, and there's three specific cases that I would like to pull out. One, Judge Colleton will be aware of, was just a few weeks ago, the Kelsey versus Ernst case, in which this court reversed the district court's grant of summary judgment on, excuse me, reversed the district court's denial of qualified immunity on a summary judgment case. And in that case, it was not in the jail context. It was a domestic disturbance at a swimming pool. The male party had been arrested. The female party, during the course of the male getting arrested, was upset. And the officer informed her that she, too, would be under arrest. She went to go tend to her daughter. And the officer said something along the line of stop, get back here. That was all it was. The woman continued to walk towards her daughter. And the officer bear hugged, tackled her, broke her collarbone, and lost consciousness. And this court has said that force was objectively reasonable. No, we didn't say that. We said that there was qualified immunity. Yes, Your Honor. And- Those are different points. Part of the focus on that was the clearly established prong. Well, that's the whole focus. And it was acknowledging that the Ehlers case from the year before that, that in Ehlers, there was no finding that there needs to be a direct threat to execute the takedown. There has to be. In Ehlers, the man was walking away from the commands to stop and come here. And- Other than the fact that Ehlers may have been wrongly decided and should be corrected in due time, how close is it to this case? Ehlers is distinguishable. Well, first of all, even if it is incorrect and should be- Some, and although Judge Calton disagreed with somebody's interpretation of Ehlers, wasn't there some testimony about only the officers that they thought Mr. Ehlers may have presented a physical threat to these officers by reaching for something or doing something? That may be correct, Your Honor. The officer who did the takedown in Ehlers, however, had just been informed by another officer, take him in, and then the plaintiff continued to walk away. And at that point, the takedown occurred. Here, what's significant, twofold significant is here we have the heightened need for security because we are in a jail. What struck me about, I shouldn't laugh, the video, there's another person asleep on a bunk. Yes, Your Honor. Sort of wakes up, I shouldn't laugh. And then after the other two people, the sheriff and the Mr. Parrish leave, the fellow pulls his blanket back over his head and goes to sleep. Yes, Your Honor. I guess it's not funny, but it struck me as being, I did not see, the other fellow didn't seem to pose any great threat of leading a mass jail escape. But on the same token, plaintiff's counsel talks about the need to use your words. Was the jailer Dingman required to leave that jail cell door open to discuss it, despite the fact he already used his words and said, no, you will not be allowed to exit the jail cell. But what's significant, Your Honor, is even if all of these cases may have been wrong, may have been right, it is still, that gets us to the clearly established prong that Jailer Dingman can reasonably rely on these cases. I think we know as a play also, I mean, the court has also said, the Supreme Court has told you don't have to have a case, the spotted cow case as we learned in contracts or something in first year in law school. Does it have to be a spotted cow case here before the defendant can be held liable? No, Your Honor, there is no spotted cow, but it needs to be a reasonable requirement that he knows what he was doing was unconstitutional. Here, he followed his training, he followed the policy of the jail in doing this takedown. Moreover- What was the jail policy? The jail policy when it was, it's provided in the materials, but it is if there is a threat of escape or injury to person or property impeding with the jailer's ability to do his or her job, that they may use force. And then it's your traditional continuum levels of force. So this takedown was the lowest level of force possible. And what- Which triggering event under the policy do you say happened here? Threat of escape or- Both, Your Honor. It is, as the district found, it is objectively reasonable from the perception of an officer that an individual stating he intended on impeding the jail cell door being closed, that that is sufficient. That he intended to not be in that jail cell. Yeah, he didn't want to have a bunk made, but I don't know whether that's really a threat of escape. You really want to say that's a threat of escape? I believe a reasonable officer could perceive that somebody preventing the door from closing is a reasonable threat of- Notwithstanding that person's, quite obvious, at least to this officer's, disabilities. In terms of being able to run a down the hall, that sort of thing, and escape from the facility? Well, Your Honor, the- The officers take the people as they find them. In this case, this officer knew Mr. Parrish, or knew of his disabilities. Correct, Your Honor. And he knew he needed the special shoe and he needed the glasses. In this, Jailor Dingman- What was the other thing in the policy that could trigger use of force? Threat of injury or- Injury to person or property. And it- So what do they say here? That the inmate pushed the mattress against the jailer? Correct, Your Honor. The mattress made contact with the jailer's body. And in the undisputed testimony, Jason Dingman believed that the plaintiff could strike him at that point and had the potential to strike him. Strike him, you mean with his fist? With his fist, excuse me. The mattress was in one body. Maybe the hardened mattress that they give these people. Well, I can't attest to the comfort of these mattresses. That's beyond the scope of this. The- No, maybe we could- I don't know if we can take judicial notice. No, I don't mean to be flippant about it. Your Honors, the other two cases I'd like to briefly discuss that are recent have both had significantly more injury. We are allowed to look at the outcome here. And the outcome is- Thanks to Judge Carlton's learned it. No, I joined it. So I guess it was a good opinion. Moneycock or what was the name? Pennycock. Chambers against Pennycock, yeah. Yes, but Your Honor, the injury here was very insignificant. I see my time has expired. I respectfully request that this court affirm the district court's opinion. We thank you for your argument. Thank you. Well, Mr. Bergman, you reserved some time. Thank you, Your Honor. Which means I won't have to use my benevolent nature to give you some. I'm going to try not to even use what I've got. No objection. Back up, Matt. No means no. You're going to be okay. That guy's going to sleep all night. It's going to be all right. I want to keep an eye on you. Those are all reasonable objective alternatives to using force. The escape is- I'm sorry, I missed the point. You mean he just could have said something to the guy? Right. I mean, we get to the point where it's like, oh, the mattress is in the door, and then it's like everything goes in fast forward, right? So because Officer Dingman sees the mattress toward the door, everything goes in fast forward, right? But that's not necessary. Well, but there's no least restrictive means requirement, right? No. There's a reasonableness requirement. That's right. So how much leeway does a deputy have if the inmate is not cooperating, and is resisting, and pressing the mattress against him, and so forth? If he doesn't go overboard, if he just does a- I understand it was a takedown, which is not gentle. But why isn't that at least within the range of reasonableness? He's in jail, right? They've already taken him through the booking process. Right. They know he doesn't have any weapons. They know about the disabilities. The arm that's not holding the mattress, he knows, is the bad arm, right? Those are things that are known to him. What's your point? There's no threat to the deputy? The deputy stated that he doesn't know that Mr. Parrish could even do any harm to him. That's undisputed in the record. So what should he do to get compliance? If the guy, he already told him to put the mattress in, and the guy disobeyed. So what are his options then? I haven't read the Kelsey Vierance case, but trust me, my colleague here used things such as the officer informed him that he needs to step back and close the door. The officer said, stop, get back here. The officer should say, back up, you're going to need to stay here. Those are the objectively reasonable things. And so, Your Honor, I just encourage you to think carefully the next time that we're here arguing about this, what the Parrish v. Dingman case is going to stand for. And if resistance goes away, and if being handicapped matters, or if any of this matters, if you have no more questions, I'm going to wait the last three seconds. Thank you. The case has been vigorously and well argued. It is now submitted and we will take it under consideration.